T.C. Memo. 2018-94

UNITED STATES TAX COURT

MICHAEL AMELSBERG AND CHRISTINA AMELSBERG, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 28090-15.                          Filed June 28, 2018.

Michael Amelsberg and Christina Amelsberg, pro sese.

Eric M. Heller, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge: Respondent determined deficiencies in, additions under

section 6651(a)(1)[1] to, and accuracy-related penalties under section 6662(a) on

petitioners' Federal income tax (tax), as follows:

_____

[1]All section references are to the Internal Revenue Code (Code) in effect for
the years at issue. All Rule references are to the Tax Court Rules of Practice and
Procedure.

[*2]

| Year | Deficiency | Addition to Tax Under Sec. 6651(a)(1) | Accuracy-Related Penalty Under Sec. 6662(a) |
|------|-----------|----------------------------------------|----------------------------------------------|
| 2008 | $134,323 | $33,572 | $26,864 |
| 2010 | 180,471 | 45,117 | 36,094 |
| 2012 | 20,813 | --- | 4,162 |
| 2013 | 55,465 | --- | 11,093 |

The issues remaining for decision are:[2]

(1) Do petitioners have for their taxable year 2008 unreported income of $56,892 from the sale of certain stocks during that year?  We hold that they do.

(2) Does Cowboy Express Steakhouse, an S corporation that petitioner Michael Amelsberg wholly owned during 2008 and 2010, have for its taxable

_____

[2]On brief, respondent concedes all other determinations in the notice of deficiency that respondent issued to petitioners for their taxable years 2008, 2010, 2012, and 2013 (notice), the years at issue, except those determinations the resolution of which flows automatically from our resolution of the issues that remain for decision.

[*3] years 2008 and 2010 unreported gross receipts of $211,947 and $129,741,[3] respectively? We hold that it does.[4]

(3) Are petitioners entitled for their taxable year 2012 to a deduction of $43,686 for a claimed net operating loss carryover? We hold that they are not.

(4) Is RIP Design, Inc., an S corporation that petitioner Michael Amelsberg wholly owned during 2013, entitled for its taxable year 2013 (a) to exclude from gross receipts or sales in determining total income or loss the entire amount of cost of goods sold that it claimed and (b) to deduct from total income or loss in determining ordinary business income or loss the entire amount of rent and the entire amount of certain other expenses that it claimed? We hold that it is not.[5]

---

[3]At trial, respondent conceded that respondent's determination in the notice that Cowboy Express Steakhouse (Cowboy) has gross receipts of $793,599 for 2010 is incorrect and that the correct amount of its gross receipts for that year is $771,375.21. That concession reduces from $151,965 to $129,741 the amount of unreported gross receipts that respondent maintains on brief Cowboy has for its taxable year 2010.

[4]Our holding affects the amount of total income or loss attributable to Cowboy that petitioners have from Schedule E, Supplemental Income and Loss (Schedule E), for each of their taxable years 2008 and 2010.

[5]Our holding affects the amount of total income or loss attributable to RIP Design, Inc. (RIP Design), that petitioners have from Schedule E for their taxable year 2013.

**[\*4]** (5) Are petitioners liable for each of their taxable years 2008 and 2010 for the addition to tax under section 6651(a)(1)? We hold that they are.

FINDINGS OF FACT[6]

Some of the facts have been stipulated and are so found.

Petitioners resided in California during each of the years 2008, 2010, 2012, and 2013 and at the time they filed the petition.

Petitioner Michael Amelsberg (Mr. Amelsberg) owned 100 percent of the common stock of Cowboy, which was incorporated in February 2007 under the laws of the State of California. At all relevant times, including during 2008 and 2010, Cowboy, which was an S corporation for each of its taxable years 2007, 2008, 2009, and 2010, was in the business of operating a restaurant (restaurant business) in Big Bear City, California (Big Bear City). Cowboy maintained an automatic teller machine (ATM) on its restaurant business premises and supplied that machine with cash. In operating its restaurant business, Cowboy accepted cash, checks, and credit card payments.

---

[6]Unless otherwise indicated, our findings of fact relating to (1) petitioners pertain to 2008, 2010, 2012, and 2013, (2) to Cowboy pertain to 2008 and 2010, and (3) to RIP Design pertain to 2013. For clarity, we sometimes refer in our findings to one or more of those years.

[*5] During 2008 and 2010, Cowboy maintained a checking account at Union Bank (Cowboy's checking account). During 2008, the deposits into Cowboy's checking account, which were made both electronically and nonelectronically, totaled $1,265,757.77. During 2010, the deposits into Cowboy's checking account, which also were made both electronically and nonelectronically, totaled $902,681.84.

Around September 2010, petitioners agreed to sell for $1.6 million (purchase price) all of the assets of Cowboy, including its real property and its personal property, to Mike Nelson and Sherry Nelson (collectively, buyers). Petitioners and the buyers allocated $920,000 of the purchase price to Cowboy's personal property and $680,000 to its real property. The sale of Cowboy's personal property took place around November 23, 2010.

Mr. Amelsberg owned 100 percent of the common stock of RIP Design, which was incorporated in August 2012 under the laws of the State of California. During 2013, RIP Design, which was an S corporation for its taxable year 2013, was in the business of selling appliances in Big Bear City.

RIP Design and Jack Bailey and Robin Bailey (collectively, Baileys) entered into a commercial lease (Baileys lease) dated January 1, 2013. Pursuant to the Baileys lease, RIP Design leased from the Baileys for the one-year term Jan-

[*6] uary 1 through December 31, 2013, certain real property and improvements in Big Bear City. The monthly rent due from petitioners under the Baileys lease was $2,000.

RIP Design and Louis Ungar and Louise Ungar (collectively, Ungars) entered into a commercial lease (Ungars lease) dated December 13, 2012. Pursuant to the Ungars lease, RIP Design leased from the Ungars for the one-year term January 1 through December 31, 2013, certain property in Big Bear City. The monthly rent due from petitioners under the Ungars lease was $2,000.

TD Ameritrade Clearing, Inc. (Ameritrade), issued to Mr. Amelsberg eight Forms 1099-B, Proceeds From Broker and Barter Exchange Transactions (Form 1099-B), for his taxable year 2008, one for each of eight sales during that year of certain stock that he owned. The gross sale prices for those sales that Ameritrade showed on those Forms 1099-B totaled $56,892.

Cowboy prepared Form 1120S, U.S. Income Tax Return for an S Corporation (Form 1120S), for each of its taxable years 2008 (2008 Form 1120S) and 2010 (2010 Form 1120S).[7] In its 2008 Form 1120S, Cowboy claimed gross receipts or sales of $865,773, cost of goods sold of $740,353, total income of

---

[7]The record does not establish whether Cowboy filed its 2008 Form 1120S and its 2010 Form 1120S with respondent.

[*7] $125,420, total deductions of $256,117, and an ordinary loss of $130,697. In its 2010 Form 1120S, Cowboy claimed gross receipts or sales of $641,634, cost of goods sold of $342,293, total income of $299,341, total deductions of $367,113, and an ordinary loss of $67,772.

Cowboy prepared and issued to Mr. Amelsberg Schedule K-1, Shareholder's Share of Income, Deductions, Credits, etc. (Schedule K-1), for each of its taxable years 2008 (2008 Schedule K-1) and 2010 (2010 Schedule K-1). In its 2008 Schedule K-1, Cowboy showed -$130,697 as the share of Mr. Amelsberg, the sole stockholder of that company, of its claimed ordinary business loss. In its 2010 Schedule K-1, Cowboy showed -$67,772 as Mr. Amelsberg's share of its claimed ordinary business loss.

RIP Design prepared Form 1120S for its taxable year 2013 (2013 Form 1120S).[8] In its 2013 Form 1120S, RIP Design reported gross receipts or sales of $204,353 and claimed cost of goods sold of $63,184, total income of $141,169, total deductions of $108,260, ordinary business income of $32,909, and a section 179 deduction of $2,785.

---

[8]The record does not establish whether RIP Design filed its 2013 Form 1120S with respondent.

**[*8]** RIP Design prepared and issued to Mr. Amelsberg Schedule K-1 for its taxable year 2013 (2013 Schedule K-1). In its 2013 Schedule K-1, RIP Design showed $32,909 as Mr. Amelsberg's share of its claimed ordinary business income and $2,785 as his share of its claimed section 179 deduction.

On June 30, 2015, petitioners mailed to respondent Form 1040, U.S. Individual Income Tax Return (Form 1040), for each of their taxable years 2008 (2008 return) and 2009 (2009 return). Respondent received petitioners' 2008 return and 2009 return on July 2, 2015.

Petitioners included Schedule E (2008 Schedule E) with their 2008 return. In their 2008 Schedule E, petitioners claimed a nonpassive loss and a total S corporation loss of $130,697, which was attributable to Mr. Amelsberg's 100 percent ownership of Cowboy. Petitioners did not report in their 2008 return the sales of any stock.

Petitioners included Schedule E (2010 Schedule E) with their 2010 return. In their 2010 Schedule E, petitioners claimed a nonpassive loss and a total S corporation loss of $67,772, which was attributable to Mr. Amelsberg's 100 percent ownership of Cowboy.

**[*9]**    Petitioners timely filed Form 1040 for each of their taxable years 2012 (2012 return) and 2013 (2013 return).  In their 2012 return, petitioners claimed "Other income" of -$43,686.

Petitioners included Schedule E (2013 Schedule E) with their 2013 return. In their 2013 Schedule E, petitioners claimed nonpassive income of $32,909, a section 179 deduction of $2,785, and total S corporation income of $30,124, which was attributable to Mr. Amelsberg's 100 percent ownership of RIP Design.

Respondent assigned a revenue agent to examine petitioners' 2008 return, 2010 return, 2012 return, and 2013 return (respondent's examination in question). Petitioners did not cooperate with the revenue agent during respondent's examination in question and did not provide him with any documents that he requested during that examination.  Consequently, the revenue agent performed a bank deposits analysis in order to ascertain whether Cowboy had underreported the gross receipts that it had claimed in each of its 2008 Form 1120S and its 2010 Form 1120S.  (We shall refer to (1) the bank deposits analysis that the revenue agent performed with respect to the gross receipts that Cowboy claimed in its 2008 Form 1120S as the 2008 bank deposits analysis and (2) the bank deposits analysis that the revenue agent performed with respect to the gross receipts that Cowboy claimed in its 2010 Form 1120S as the 2010 bank deposits analysis.  We shall refer

[*10] collectively to the revenue agent's 2008 bank deposits analysis and his 2010 bank deposits analysis as the bank deposits analyses in question.)

In order to perform the bank deposits analyses in question, the revenue agent issued respective summonses to Union Bank with respect to Cowboy's checking account and to First Mountain Bank with respect to petitioners' personal bank accounts. As part of the bank deposits analyses in question, the revenue agent analyzed each deposit into Cowboy's checking account during each of the years 2008 and 2010 in order to determine the total deposits into that account during each of those years. The revenue agent then analyzed each deposit into Cowboy's checking account during each of the years 2008 and 2010 in an effort to determine whether any of those deposits was not taxable because, for example, it was a loan, a transfer from another bank account, or another type of nontaxable deposit. As a final step in the bank deposits analyses in question, the revenue agent reduced the total deposits into Cowboy's checking account during each of the years 2008 and 2010 that he had determined by the total amount that he had determined were nontaxable deposits in order to arrive at the total amount of taxable deposits into that checking account for each of those years.

Pursuant to the 2008 bank deposits analysis, the revenue agent determined that during 2008 (1) total deposits into Cowboy's checking account were

[*11] $1,265,757.77, (2) total nontaxable deposits into that account were $110,396.09, and (3) total taxable deposits into that account were $1,155,361.68.

Pursuant to the 2010 bank deposits analysis, the revenue agent determined that during 2010 (1) total deposits into Cowboy's checking account were $902,681.84, (2) total nontaxable deposits into that account were $72,196.07, and (3) total taxable deposits into that account were $830,485.77.

During respondent's examination in question, the revenue agent spoke with one of the buyers who had purchased in 2010 from petitioners Cowboy's real property and personal property. That buyer provided the revenue agent with some documents relating to each of the years 2008 and 2010 that he claimed he received when he made that purchase (buyer's documents).[9] The revenue agent reviewed the buyer's documents and decided to accept certain information reflected therein. That is because his acceptance of that information in those documents resulted in his determining that Cowboy had an amount of unreported gross receipts for each of the years 2008 and 2010 that was less than the amount that he had determined under the bank deposits analyses in question.

---

[9]We sustained petitioners' objection to the admission of the documents that one of the buyers had provided to the revenue agent, and they are not part of the record.

[*12] Pursuant to the bank deposits analyses in question, as modified in favor of Cowboy by certain information in certain documents that the revenue agent received from one of the buyers of Cowboy's real property and personal property, the revenue agent determined that Cowboy has unreported gross receipts for its taxable years 2008 and 2010 of $211,947 and $151,965, respectively.

Respondent issued the notice to petitioners. In the notice, respondent determined on the basis of the revenue agent's bank deposits analyses in question that Cowboy has unreported gross receipts for its taxable years 2008 and 2010 of $211,947 and $151,965,[10] respectively. Consequently, respondent further determined in the notice to adjust consistently the respective amounts of ordinary losses attributable to Cowboy that petitioners had claimed in their 2008 Schedule E and their 2010 Schedule E.

Respondent also determined in the notice that petitioners have for their taxable year 2008 unreported income of $56,892 from the sale of certain stocks during that year.

---

[10]See supra note 3 regarding a concession that respondent made at trial reducing to $129,741 the amount of unreported gross receipts that respondent now contends Cowboy has for its taxable year 2010.

**[*13]** Respondent further determined in the notice that petitioners are not entitled for their taxable year 2012 to a deduction of $43,686 for a claimed net operating loss carryover.

In addition, respondent determined in the notice to disallow part of each of the total respective amounts of cost of goods sold, certain rent expenses, and certain other expenses that RIP Design claimed in its 2013 Form 1120S. Consequently, respondent further determined in the notice to adjust consistently the amount of ordinary business income attributable to RIP Design that petitioners had claimed in their 2013 Schedule E.

Respondent also determined in the notice that petitioners are liable for each of their taxable years 2008 and 2010 for the addition to tax under section 6651(a)(1).

OPINION

Petitioners bear the burden of establishing that the determinations in the notice that remain at issue are erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Moreover, deductions are a matter of legislative grace, and petitioners bear the burden of proving entitlement to any deduction claimed. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). The Code and the regulations thereunder required petitioners, Cowboy, and RIP Design to maintain

**[*14]** records sufficient to establish the amount of any deduction claimed. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

We begin by summarizing our evaluation of the evidence proffered at the trial in this case. We address first the testimony of Mr. Amelsberg. We found his testimony to be not credible, uncorroborated, self-serving, and/or conclusory in certain material respects. We are unwilling to, and we shall not, rely on Mr. Amelsberg's testimony to establish petitioners' position with respect to each of the issues presented. See, e.g., Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

Petitioners proffered at trial certain documentary evidence in support of petitioners' position with respect to the determinations that respondent made for RIP Design's taxable year 2013 disallowing certain claimed cost of goods sold, certain claimed rent expenses, and certain other claimed expenses. We sustained respondent's objection to those proffered documents.

We turn now to the issues presented. The first issue that we consider is whether petitioners have for their taxable year 2008 unreported income of $56,892 from the sale of certain stocks during that year. Petitioners argue that, in determining the amount of gain or loss from Mr. Amelsberg's sales of certain stock during 2008, "the purchase amount" must be taken into account. As we understand their argument, petitioners maintain that the basis of each of the stocks that

[*15] Mr. Amelsberg sold during 2008 must be taken into account in determining the amount of gain or loss from those sales. We agree. However, there is no evidence in the record that establishes the basis that Mr. Amelsberg had in each of the stocks that he sold during 2008.

On the record before us, we find that petitioners have failed to carry their burden of establishing that for their taxable year 2008 they do not have unreported income of $56,892 from the sales of certain stocks during that year.

We next consider whether Cowboy, an S corporation that Mr. Amelsberg wholly owned during 2008 and 2010, has for its taxable years 2008 and 2010 unreported gross receipts of $211,947 and $129,741.[11] Petitioners did not cooperate with the revenue agent during respondent's examination in question and did not provide him with any documents that he requested during that examination. Consequently, the revenue agent performed the bank deposits analyses in question in order to determine whether Cowboy had underreported the gross receipts that it had claimed in each of its 2008 Form 1120S and its 2010 Form 1120S.

In order to perform the bank deposits analyses in question, the revenue agent issued respective summonses to Union Bank with respect to Cowboy's checking account and to First Mountain Bank with respect to petitioners' personal

---

[11]See supra note 3.

[*16] bank accounts.  As part of the bank deposits analyses in question, the revenue agent analyzed each deposit into Cowboy's checking account during each of the years 2008 and 2010 in order to determine the total deposits into that account during each of those years.  The revenue agent then analyzed each deposit into Cowboy's checking account during each of the years 2008 and 2010 in an effort to determine whether any of those deposits was not taxable because, for example, it was a loan, a transfer from another bank account, or another type of nontaxable deposit.  As a final step in the bank deposits analyses in question, the revenue agent reduced the total deposits into Cowboy's checking account during each of the years 2008 and 2010 that he had determined by the total amount that he had determined were nontaxable deposits in order to arrive at the total amount of taxable deposits into that checking account for each of those years.

Pursuant to the 2008 bank deposits analysis, the revenue agent determined that during 2008 (1) total deposits into Cowboy's checking account were $1,265,757.77, (2) total nontaxable deposits into that account were $110,396.09, and (3) total taxable deposits into that account were $1,155,361.68.

Pursuant to the 2010 bank deposits analysis, the revenue agent determined that during 2010 (1) total deposits into Cowboy's checking account were

[*17] $902,681.84, (2) total nontaxable deposits into that account were $72,196.07, and (3) total taxable deposits into that account were $830,485.77.

During respondent's examination in question, the revenue agent spoke with one of the buyers who had purchased in 2010 from petitioners Cowboy's real property and personal property. That buyer provided the revenue agent with some buyer's documents relating to each of the years 2008 and 2010 that he claimed he received when he made that purchase. The revenue agent reviewed the buyer's documents and decided to accept certain information reflected therein. That is because his acceptance of that information in those documents resulted in his determining that Cowboy had an amount of unreported gross receipts for each of the years 2008 and 2010 that was less than the amount that he had determined under the bank deposits analyses in question.

Pursuant to the bank deposits analyses in question, as modified in favor of Cowboy by certain information in certain documents that the revenue agent received from one of the buyers of Cowboy's real property and personal property, the revenue agent determined that Cowboy has unreported gross receipts for its taxable years 2008 and 2010 of $211,947 and $151,965, respectively.

As we understand their position, petitioners contend that some of the deposits into Cowboy's checking account during each of the years 2008 and 2010

[*18] that respondent determined to be taxable were nontaxable loans or nontaxable reimbursements from the ATM that they maintained on Cowboy's premises, which the revenue agent should not have included as taxable gross receipts of Cowboy in the bank deposits analyses in question. We disagree.

On the record before us, we find that petitioners have failed to carry their burden of establishing that for each of its taxable years 2008 and 2010 Cowboy has nontaxable deposits in excess of the amount of nontaxable deposits that the revenue agent determined it has under each of his 2008 bank deposits analysis and his 2010 bank deposits analysis, as modified by respondent's concession at trial.[12] On that record, we further find that petitioners have failed to carry their burden of establishing that for its taxable years 2008 and 2010 Cowboy does not have unreported gross receipts of $211,947 and $129,741, respectively.

We now address whether petitioners are entitled for their taxable year 2012 to a deduction of $43,686 for a claimed net operating loss carryover. Petitioners advance no argument on brief with respect to this issue. We believe that our holding with respect to Cowboy's unreported gross receipts for each of its taxable years 2008 and 2010, which affects the amount of total income or loss attributable to Cowboy that petitioners have from each of their 2008 Schedule E and their

---

[12]See supra note 3.

**[*19]** 2010 Schedule E, will eliminate any net operating loss carryover to petitioners' taxable year 2012. In the event that it does not, we find on the record before us that petitioners have failed to carry their burden of establishing that they are entitled for their taxable year 2012 to a deduction of $43,686 for a claimed net operating loss carryover.

We next turn to whether RIP Design, Inc., an S corporation that petitioner Mr. Amelsberg wholly owned during 2013, is entitled for its taxable year 2013 (1) to exclude from gross receipts or sales in determining total income or loss the entire amount of cost of goods sold that it claimed and (2) to deduct from total income or loss in determining ordinary business income or loss the entire amount of rent expenses and the entire amount of certain other expenses that it claimed.

A taxpayer is allowed to reduce or offset the gross receipts of the taxpayer's trade or business by the cost of goods sold in carrying on the trade or business. See sec. 1.61-3(a), Income Tax Regs. Section 162(a) generally allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. In addition, for certain kinds of expenses that are otherwise deductible under section 162(a), such as those for "listed property", as defined in section 280F(d)(4), a taxpayer must satisfy certain additional sub-

[*20] stantiation requirements set forth in section 274(d) before such expenses will be allowed as deductions.

The record contains no reliable evidence establishing error in respondent's determinations in the notice disallowing for RIP Design's taxable year 2013 certain claimed cost of goods sold and certain claimed expenses.  On the record before us, we find that petitioners have failed to carry their burden of establishing that for RIP Design's taxable year 2013 it paid or incurred the cost of goods sold that respondent disallowed (disallowed claimed cost of goods sold) and certain rent expenses and other expenses that respondent disallowed (disallowed claimed expenses) and/or that RIP Design paid or incurred the disallowed claimed cost of goods sold and the disallowed claimed expenses in carrying on its trade or business and/or that the disallowed claimed expenses were ordinary and necessary expenses that RIP Design paid or incurred in carrying on its trade or business.  On that record, we sustain respondent's determinations in the notice disallowing for RIP Design's taxable year 2013 the disallowed claimed cost of goods sold and the disallowed claimed expenses.

We address finally whether petitioners are liable for each of their taxable years 2008 and 2010 for the addition to tax under section 6651(a)(1).  Respondent

[*21] bears the burden of production with respect to that addition to tax.[13]  See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  To satisfy respondent's burden of production, respondent must come forward with sufficient evidence showing that it is appropriate to impose the addition to tax that is at issue.  See Higbee v. Commissioner, supra at 446.  Although respondent bears the burden of production with respect to the addition to tax under section 6651(a)(1), respondent "need not introduce evidence regarding reasonable cause, substantial authority, or similar provisions.  * * * the taxpayer bears the burden of proof with regard to those issues."  Higbee v. Commissioner, supra at 446.

On June 30, 2015, petitioners mailed to respondent their 2008 return and their 2009 return.  Respondent received those returns on July 2, 2015.  Section 6651(a)(1) imposes an addition to tax for failure to file timely a tax return.  On the record before us, we find that respondent has satisfied respondent's burden of production under section 7491(c) with respect to the addition to tax under section 6651(a)(1) that respondent determined for each of petitioners' taxable years 2008 and 2010.

---

[13]Respondent's burden of production does not include showing compliance with sec. 6751(b)(1).  That is because sec. 6751(b)(1) does not apply to, inter alia, the addition to tax under sec. 6651(a)(1).  See sec. 6751(b)(2)(A).

[*22] The addition to tax under section 6651(a)(1) does not apply if the failure to file timely is due to reasonable cause and not to willful neglect. See sec. 6651(a)(1). We conclude that petitioners have abandoned any argument that they are not liable for each of their taxable years 2008 and 2010 for the addition to tax under section 6651(a)(1). That is because petitioners introduced no evidence at trial and advance no argument on brief with respect to that issue. On the record before us, we find that petitioners are liable for each of their taxable years 2008 and 2010 for the addition to tax under section 6651(a)(1).

We have considered all of the parties' respective contentions and arguments that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing and respondent's concessions,

Decision will be entered

under Rule 155.